The first case this morning is Rodriguez v. Rich 24-2163. Counsel for Appellant, if you would make your appearance and proceed, please. Good morning, Your Honors. My name is Heather Burke, and may it please the Court, I represent Plaintiff Appellant Marty Rodriguez and Joshua Rodriguez. I would like to reserve three minutes for rebuttal. The Family and Medical Leave Act 29 U.S.C.S. Section 2601 was enacted by Congress to entitle employees to take reasonable leave for medical reasons. In enacting this law, they recognized there was inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods. On the night of February 20th, 2020, after working a full eight-hour day plus 15 minutes of overtime, Jeremy Rodriguez Ortega was hospitalized for emergency treatment by his FMLA qualifying condition. As a direct result of his hospitalization, Jeremy was unable to give notice of his need for leave within 30 minutes of his shift the following day. 29 CFR 825.303C provides that when an employee is receiving emergency medical treatment, he is not required to comply with employer call-in requirements. However, on the first day he was absent, Jeremy's family informed Defendant Rich that Jeremy had been hospitalized, giving Defendant Rich notice of Jeremy's need for FMLA leave. 29 CFR 825.303A provides that a family may give notice. There is no requirement under the law, however, that family members must give notice at all, let alone by a certain time in the day. And the court Ms. Burke, can I just interrupt you for a quick second here? I just want to make sure I understand the scope of this appeal. As I understand it, there are only certain claims that are at issue here now, right, relative to what was at play in the district court. For example, you're not challenging that terminating Mr. Rodriguez was not, well, let's see, what are the, let me just state it otherwise. Why don't you tell us what claims you perceive to be present on appeal now? So, in this appeal, the primary substantive issues are the FMLA interference and retaliation claim, as well as the issue of whether or not defendants admitted the allegations in plaintiff's complaint when they failed to timely file their answer brief. Well, just to be clear, what specific factual instances are at play in the retaliation and interference claims? I mean, was there a number, like there were two instances related to leave, and so what specific instances are you challenging here? So, the instances happened, there is a six-day period in February of 2020 when Mr. Rodriguez Ortega was hospitalized, and then there was a second incidence, again, where he was hospitalized in May of 2020, and those are the two primary periods that we're alleging for the FMLA interference. Okay, that's helpful. Now, I have one other, well, I have one question, Ms. Burke. Sure. You only have one appellant here, correct? Even though you've named two appellants in your pleadings. So, you are correct, Your Honor, and when I filed this notice of appeal, we were intending to only appeal the FMLA issues, and because Joshua Rodriguez does not have FMLA claims, he was not named in the initial appeal. He's become more of an interested third party when we added the appeal of the motion to strike and the issues related to the failure to deny, but he is not a technical appellant, Your Honor. You are correct. Okay, thank you. Okay, I just have one clarification on your response to Judge Holmes also, and that is, I thought you said that that issue in this appeal were both your retaliation and interference claims, but your briefing only discusses the two interference claims that you just now mentioned, and I think it's noted, it was noted in response that you seem to have abandoned your retaliation claims. So, I just want to confirm that you misspoke there and that you aren't continuing with those retaliation claims. I think, arguably, the retaliation claims could have been abandoned, but they're also dependent on these issues of whether or not notice was properly given, because if notice... Well, you have to argue them. You've got to argue them on appeal. They're separately considered and decided by the district court. They're all lumped together and they have a different set of elements for sure. So, I just, I'm trying to clarify what our issues are here, and it seems to me you're suggesting that you only argued the interference claims, the two interference adverse instances. Well, there are multiple adverse interferences in two separate periods, because each time that Jeremy was marked AWOL is itself its own discrete adverse event, because each time he was denied the use of paid leave, he was damaged. Okay. Now, the district court decided the interference claims based on the third prong, the causation found there was a lack of causation because Jeremy was, in both instances, marked AWOL because of, at least for some part of that time, and because of his failure to provide notice under the company policy. You didn't raise this issue about what I call the unusual circumstances regulation, which is 29 CFR 825.303 that you mentioned a little bit ago, Section C. It didn't seem to me that you raised that issue below at all. And yet, this seems to be your primary issue on appeal is whether somehow they acted in violation of that regulation. Your Honor, we've cited 29 CFR 825.303 C. I believe you cited it, but there was no argument about this, and that's different. We argued that he was incapacitated by his medical treatment, which are the unusual circumstances. We may not have used the phrase unusual circumstances, but the unusual circumstance is clearly that he was incapacitated by emergency medical treatment. Well, isn't that... I'm sorry. No, go ahead. I'm sorry. Well, I was going to say, isn't that also relevant and provided for in the company's policy that they found that he violated? Because it provides that, basically, I think it says that you have to give notice unless it's not practical, which would essentially have been your argument, which the district court rejected, that it wasn't practical. Well, the district court rejected that it wasn't for unclear reasons, while also finding that Jeremy's family must have given notice. Now, the district court, for some reason, believed he was absent on the Thursday first, but he wasn't. He worked a full day, including 15 minutes of overtime, and then went to the hospital that night. He was absent for the first time on the Friday, and the Friday is the day the family gave notice. So, they had noticed the very first day of his absence, and it's important to note that there's nothing in the record to suggest Jeremy had ever been absent before without taking notice. Notice the first day, and you go back to what you just said, because you mentioned notice the first day, and yet notice the first day of an absence is not sufficient, is it? I mean, once you get out of the hospital, we don't get to just keep stretching that notice, right? Isn't that the problem here? He was still in the hospital, Your Honor, for three days. Are we talking about May or February? February, Your Honor. What about May? Did he even seek FMLA in February or in May? Did he seek FMLA? Yes, he did. On his way to the hospital in May, he invoked FMLA in a text message, and it's a question of fact whether or not that was sufficient to give notice of his need for leave when he became incapacitated. Now, it's important for Your Honors to understand that Mr. Rodriguez-Ortega's health condition resulted in a flood of toxicity to his system, which created confusion. It created instability. It created nausea and general incapacitation. He was unconscious for a lot of the time. Now, in May, we'll remember that the pandemic had just begun, and hospitals were turning away people that weren't critically ill because of the risk of COVID. Mr. Rodriguez-Ortega was obviously very high risk for COVID complication, so he would have normally been admitted the first time when he went to the hospital in May, but because of the risk, they sent him home again. Eventually, during his period of absence in May, he was actually admitted to the hospital for several days. He was in and out of the hospital, I believe, three times during his period of absence in May. In February, he was also hospitalized immediately. This was prior to the pandemic. He was hospitalized immediately and then incapacitated by his painkillers and his general malaise from his treatment because there was really not much they could do for him for this. Once his kidneys started failing, they could help with the toxicity. He eventually went on to dialysis, but even then, he was regularly incapacitated by these symptoms. Again, his notice was given on the Friday of the February leave, but yeah, he was marked AWOL that first day. They knew he was in the hospital, they had actual notice from his family, and they marked him AWOL anyway. They then, on Monday, Tuesday, and Wednesday of the following week, properly designated his leave as FMLA qualifying, but then Thursday, for some reason, decided three hours of that day he was AWOL and five hours of that day he was FMLA protected. Then, the following day, the Friday, a week from his first hospitalization, he was marked AWOL for the entire day. There's no rhyme or reason, nor is there anything in the record to suggest that any of those days they got more or less notice from him. They knew that entire week is a six-day period, which is inherently reasonable for a hospitalization of this nature for him to be absent. He was absent approximately a week of work. He had more than enough paid leave to cover it. He had been a state employee for 18 years and earned an enormous amount of paid leave, which he could have used for those absences and did use for the ones that were marked FMLA protected. He was denied the use of his paid leave for the AWOL-designated times, and when he returned to work, the first thing... I just want to make sure that you get to what I see. I think you're only really making two arguments, as I can see it on peel, and one was the CFR that you cited and discussed in the unusual circumstances issue. And then you seem to be challenging the district court's finding of facts, as I recall, about whether he had any responsibilities, whether his work responsibilities were removed, which this court said that they were, but then the district court also said that he didn't actually have some assignments of work responsibilities. And so you're challenging that, but I question, if you're not arguing the retaliation claims anymore, I don't understand quite what that what that issue goes to. Why is that fact material, if it is contrary? Well, at the time we're doing this, we still had our Human Rights Act claims in this case, which were retaliation and discrimination for his serious medical conditions. And therefore, the fact that his job duties were stripped, even if we take FMLA retaliation out, is still important to the issue of whether or not he was discriminated against. Can you assume for a moment that you're correct and that there is a fact issue on that? There was a controversial fact on whether his job duties were taken away. Can you explain to me how that's relevant to the interference claim? It's relevant to the interference claim because that itself discouraged him from invoking his FMLA leave in May because he was told explicitly that he could not retroactively invoke his FMLA leave, even when he was in the hospital. And that, therefore, this chilled him from wanting to take FMLA and chilled him from clearly stating that he had been in the hospital the next time this happened. All of which are questions of fact. Ms. Burke, but chilled is a language of retaliation. I mean, that's the language of a claim that I at least understood you to tell Judge Moritz is no longer on the table. Do I misunderstand that statement? And if it is no longer on the table, then the fact that there was some chilling effect really is not relevant anymore. Well, it remains relevant because by statute, interference is obtained when you discourage somebody from using their FMLA leave. So chilling somebody is the same thing as to discourage them. And that is a factor in an FMLA interference claim. And that chilling would have related to what? The May incident or the February incident? Well, both because he was denied leave for February and then he was misinformed about whether or not he could invoke his FMLA leave in May and told that he could not because he had not complied each and every day with the call-in procedure. And that is simply not the case. I guess on the timeline, when did the when did the alleged stripping of duties take place? When he returned from the February leave. OK, so it would have been as so the so any chilling after the stripping of duties would have occurred after February, right? Correct. OK, well, as I understand what you're saying, you're still saying that he was chilled or essentially prevented because he was told he couldn't retroactively take this FMLA, but I'm still trying to get how that connects to this whole issue of the fact that he did or didn't have work responsibilities. Did somebody connect, did somebody connect the dots there? Did somebody say, well, you can't have FMLA because you haven't been working or we took your duties away? I'm trying to figure out why that's material. Well, as I say, it's material for our Human Rights Act discrimination claim and it's material for the fact that he was made to feel I mean, he had no job duties while he was there, and that becomes relevant when they say that he wasn't doing his job duties. And that's one of the reasons for his termination was that he wasn't doing. But if he had no job duties to do, then that's not possible. OK, thank you. All right. Ms. Burke, your time is over, but I'll give you a minute of a rebuttal when we get to it. OK. Thank you, Your Honor. All right. We'll hear from Appleby now, please. Thank you, Your Honor. My name is Paula Mains and I represent the defendants, the New Mexico Department of Health, Ken Lucero and David Rich. May it please the court. This appeal involves a career labor relations analyst at DOH whose job it was to write formal disciplinary notices, applying facts to policies to support just cause for formal discipline. Mr. Jeremy Rodriguez Ortega was very familiar with the leave policies of the department because it was his job to assist the agency to enforce them. In spite of repeated efforts to have him comply with the requirement to notify the department 30 minutes in advance of a scheduled shift, any time he was going to use his intermittent leave and be absent from work or was not ready for work, he did not do so. In the opening brief of the of the appellant, page 24, he says in his career he always complied with notice requirements when needing to take leave. That is until two times in February and May of 2020. He failed to provide notice of his absences when he was working in the office and when he was working from home during the pandemic. On the dates when he did not work and did not call in, he nonetheless entered his time into the state's time capture system as hours worked. All of the time entries were made by him. All of the dates discussed by Judge Moritz just now with counsel for the appellant were dates when Mr. Mr. Rodriguez Ortega entered his time as time worked that day. He admits that he did. What do we make of this notice issue that was raised regarding his incapacity and the fact that his family responded? In other words, they did on the Friday after the Thursday provide notice that he was unable to earlier give the employer notice. Well, Your Honor, what happened on May 4th, and it's in the record at page 283 of our supplemental index, excuse me, supplemental appendix, that he sent a text message and I'm going to read it. I think it's helpful. This is the only communication we received in February, or excuse me, on May 4th. David, I just arrived at the emergency department at Santa Fe Press Hospital. It's a given I won't be able to telecommute for the rest of the day. Now that message doesn't tell you what hours he's claiming he worked. Ms. Burke just told you he claimed to have worked overtime that day, but it says he won't be able to telecommute for the rest of the day. So when he received that notice, Mr. Rich coded his time as half of a day of work and half of a day of FEMLA. He also said, I'll keep you posted. We never heard from him again for the entire May absence. What time was the text? You say that it was coded for half a day of work and half day of family medical leave. That's right. Roughly. I mean, I think it was five and four hours or something. Okay. Okay. Okay. Roughly. You're correct. Yes. I don't have the time in front of me. Okay. All right. Okay. That's fine. What about February then? Okay. Going back to February. February 20th. I do not know what time. We have no knowledge of what time the appellant, the plaintiff went to the hospital. We do know that he was only hospitalized on the 20th. When appellant's counsel says to you that the family spoke with the department, here's how it happened. The department reached out to his family. Nobody from the family called to provide notice. Instead, his brother, who is a co-defendant or a co-plaintiff in this case, is an employee of a different division working in a different office of Department of Health. Mr. Rich, the plaintiff's here's supervisor, found his phone number in that department and called him. He said, yes, my brother's in the hospital. That's the only communication that the family made with the department. You could ask, why didn't we call every day? Because we can't do that. That's the reason we have a policy that requires the employee to call and advise the department of intent to seek and take leave. Well, what happens if the employee is out of commission and he doesn't have any family and he's called once and said, I'm going into the hospital. Does he have to call the next day and the day after that and the day after that? You know, your honor, the answer is no. He does not have to call, but he does have to call after he says, I'll keep you posted and only wants FMLA entered for the day that he's left. Now that's in May you're talking about now. Well, that was, yes, that's May. I'm talking about February. Well, what he's supposed to do is when he is completely incapacitated, yeah, I think that might, that might give rise to unusual circumstances, but the testimony in this record at his deposition, the plaintiff said he was able to use his cell phone. He could dial and call his family was around him and he didn't ask them to call in for him. So, you know, we don't have a record where any kind of attempt was made at any time during these lengthy, you know, six day, nine day absences for him to make the effort to call in and advise us of what the status was. And that's just an admitted fact here. So, you know, I would agree that theoretically, someone could establish a case of unusual circumstances if they were, you know, unconscious, you know, taken to the hospital, but that's not the circumstances of this case. He went to the emergency department. He had a cell phone that he could dial and use just didn't happen. Well, wait a minute. So he went to the, okay, we're talking about now the February event, right? All right. Yeah. Okay. All right. So he goes to the hospital. He's in the emergency room. He texts saying that he's in the emergency room and he'll keep you advised, keep them advised. Am I, am I on the right incident now? You are. I mean, okay. The text message of that's in May, of course, that message, that text message is May 4th, Your Honor. Okay. So, so let's, let's just walk through it to make sure I have it in my head. The incident in February, what, did he go to the hospital in February? He went to the hospital on February 20th. He didn't call anybody about any of that. And that's the incident and where they reached out to his brother? That the next day on Friday, you know, remember if we look at his time records, he's entering his time as though, but just help me. I want to just make sure I have the facts right. So that's the incident where they reached out to his brother, right? On the next day, the 21st, the 21st. Okay. Well, if he's in the hospital and he's incapacitated, what do you want from him? I mean, you know, why would there be anything necessary in that situation? Well, we would have expected him if he was capable of sending a text message and letting us know he was going into the hospital. That's what I would expect. But once we heard that we coded him for AWOL because he hadn't called in on the 20th. He hadn't called in on the 21st, but he advised the brother, let him know he wasn't going to be at work the following week. In the first three days, those were coded FMLA. But to, but to, Judge Kelly's point, I mean, if he had been in a car accident and therefore went into the hospital and was doped up, what he couldn't communicate. I mean, the fact that his brother tells you that he's in the hospital, that's good. That's nice. But I mean, in terms of him not complying with the policy, I mean, what would reasonably be expected of a person who either physically was impaired at that time. And I'm using the hypothetical of the car accident, physically impaired or impaired because of medicine or other things that render them incapable, I guess. And I'm just, and I'm not, you know, passing judgment here. I'm just trying to understand in that situation, why would, why would a policy require him to do anything in that moment? Well, Your Honor, the hypothetical you pose, I would agree with you. I don't see how someone can be under an obligation to call in if they, if they're completely and totally incapacitated. Those aren't the facts. Okay, tell me. All right. And so let's, let's narrow in now, talking to February event, why is that different than the hypothetical? What is it about this, the February event that you say distinguishes it? Because it is our understanding from the record that he had a cell phone and he was capable of dialing it, you know. Okay, the capable of dialing it part, you can have a, I mean, in my hypothetical, you can have a cell phone sitting by your bed and you're encoding too. And so, I mean, you couldn't, you couldn't dial it, or if you dialed it, it would be gibberish. So having a cell phone really doesn't answer the question, does it? Well, it may. I mean, I, I just think that in these circumstances, you know, he wasn't taken by ambulance. He drove himself to the emergency room. He said he was admitted through the emergency room. You know, there's a lot of interaction and talking. He was with his partner. Somebody could have notified the department. If this happened in late at night, then I would have expected somebody to call us in the morning. That never happened. But to Judge Kelly's, to Judge Kelly's point, there may not have been somebody. I mean, not everybody has a family member. Not everybody has somebody who can call. And so if you're in a situation where, you know, and to your point about the cell phone, again, I could have my cell phone, but I may not be capable of using it. And so let me just focus on, you know, I'm trying, thank you for helping me on the facts, but let me focus on the regulation for a second. At least I was, my understanding that the district court construed that as requiring a family member to call. And if that's so, I mean, the language says, well, you seem like you were quizzical about that. Is that not how you read what the district court's order said? That essentially the family member was obliged to call? Well, I mean, one would expect the family member to call. I'm not sure the district court went that far. I just, I don't know that that's, was the district court's conclusion there. I think- Well, and to, okay, and I'm sorry, to that, let me just follow up briefly. Well, do you, how do you read the regulation? I mean, the regulation uses the language may be given by the employee spokesperson. That seems to be permissive language. And I'm thinking about 825.303a may be given by the spokesperson. Well, that's permissive language. That would seem to suggest that there was no obligation by the brother to call. There was no obligation by anybody to call. They may do it, but they weren't obliged to do it in that incapacity situation. What am I missing? You're not missing anything except that all of these events I believe took place in the evening. There wouldn't have even been anybody to call. But what I'm suggesting is that the next day, somebody should have called. That's not what- Bingo. Let's freeze frame to the next day. Next day, the question is, would the regulation have required somebody to call the next day if you, and I'm not saying you have to accept these facts, but if he was incapacitated on the next day, let's make that assumption. Would the regulations have required his brother to call? Well, I agree with you. The regulation uses the word may, but I think one of the things that the regulation also says right before that language is that in most cases of even unusual circumstances, there's an opportunity to provide notice in some manner, and the assumption is that they can accomplish that. Now, that has never, in the history of both February and May of 2020, nobody from around the family or friends of the plaintiff ever contacted- And that's what I'm trying to understand. If you accept the premise that the regulation speaks in permissive terms- Yes, I do. Then the question would be, why would they have to? I mean, it may be nice that they did it, but why would they have to if, and note here, and you can tell me if I'm wrong, but what I'm juxtaposing is incapacity and family members who could or could not call. The question would be, if they didn't have to call, isn't it enough that he was just incapacitated? Your Honor, if that were the hypothetically true, yes, I think you're correct. How do the facts differ from the hypothetical? Your Honor, I'm out of time. Can I finish? Please answer. I want to know. Okay. All right. Well, first of all, the facts were, and they were established when Mr. Rich called his brother the next day, later in the day, on the 21st, that in fact, he had been, I think he had either been, but he had knowledge that his brother was hospitalized. Now, at some point, it became apparent that, I mean, he only spent that night and the next day at the hospital. Then he was, I believe he was released. I'm not positive. But the point is this, at that point, the family knew that the employer was looking for him, wanted to know where he was and what was going on. And he admits he never, during any period in February, did he himself call in or did any member of his family call in? Now- Was he absent again in February? Excuse me? Was he absent again in February after he got out of the hospital? Well, after he got out of the hospital, he was absent February 24th, 25th, 26th, and 27th, or part of the 27th. So the answer is yes. But Judge, just quickly on interference. Interference requires that the employer knows that this employee is seeking family medical leave. We never had any notice of that. So what you're asking is for us to find interference without any knowledge on the part of the employer. He was just simply absent. He wasn't there from the perspective of the employer. So until that phone call was made by us out of concern for his well-being, he hadn't invoked any right. So you're asking us to go back and insert an obligation to recognize FIMLA when we had no knowledge that it was even in play. So we don't see how you could find interference on that record. Your Honor- I'm going to have to hit the time button now. I appreciate your thoughts and thank you for your argument. And thank you. And in rebuttal, if you will give Ms. Burke 2.5. I'm in two and a half minutes. Yes. Okay. Thank you, Your Honor. So to clarify here, I think that the record's getting a little muddied here. It is and I want your help. Let's go walk through the two instances. Okay. So Thursday, February 20th, 2020. Jeremy, there is no dispute that Jeremy worked physically in the office all day plus 15 minutes of overtime. Sometime during that evening, I want to say it was 8 p.m., but I could be wrong. He went to the hospital. There's nothing in the record to suggest he drove himself like Ms. Main said, but he went to the hospital. Some family member took him. When did he get out of the hospital? Pardon? When did he get out of the hospital? I believe he got out of the hospital sometimes Sunday or Monday. Was that the day 21st or 22nd? No, he was in the hospital for at least three days, Your Honor. I'm sorry. Speak up. He was in the hospital for at least three days. And then he was incapacitated by his medical treatment. He was on a lot of opiate painkillers, a lot of codeine and all of that stuff. For that week, he recovered. They marked him properly. So he was recuperating at home? I believe so, Your Honor. Yes. Okay. And did he call anybody during that recuperation period? There's nothing in the record to suggest one way or the other, but they recognized that he had FMLA designated leave for the Monday, Tuesday, and Wednesday of that week. Okay. Now in the May problem, didn't he have a, didn't he say he didn't know his password expired? There was some issue before he went to the hospital, like the week before, that because he didn't have any job duties and wasn't receiving emails, he didn't notice when his password expired because the department, when he was at work, he had a giant monitor because the kidney damage was affecting his eyes. Was he working during that period of time at home? Well, he was teleworking while his only job duty was to apply for disability retirement. That was what they tasked him with, even though that was not what he wanted. Thank you. So, and then in May, because he recognized that he was supposed to make sure he was giving notice, he did, in fact, give notice on his way to the hospital. Now, when you're on your way to the hospital suffering a medical emergency, you don't know if they're going to admit you and you don't know what's going to happen next. You don't know what kind of drugs they're going to put you on. You don't know any of that stuff. So, saying that you're going to stay in touch is his intent to stay in touch. It doesn't mean that his medical condition allowed him to do so. And that becomes the question of fact for the jury is whether or not the May text gave sufficient notice that defendants should assume that he was invoking FMLA instead of calling him and telling him that he was going to be fired because he missed work and he could not retroactively designate his time. All right. Thank you, counsel, for your arguments. The case is submitted. Thank you, Your Honor. Thank you.